UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

IN THE MATTER OF AN                  §
                                     §
ARBITRATION AGREEMENT                §
                                     §          NO. 1:17-cv-00276
BETWEEN HENRY CONTROLS, INC.         §
                                     §
 & ULTRA ELECTRONICS NSPI            §

## MOTION TO COMPEL ARBITRATION WITH BRIEF

TO THE HONORABLE JUDGE OF SAID COURT:

Henry Controls, Inc. Movant, applies to this Court for an order to compel Ultra Electronics NSPI, Respondent, to engage in arbitration under the Texas Arbitration Act, Civil Practice and Remedies Code Chapter 171 and in support of this motion shows:

## I.  THE PARTIES

1.      Movant Henry Controls, Inc. is a Canadian Corporation doing business in Canada and the United States.  The President is Hank Rasanen, a Canadian citizen and registered agent with offices at 32 Heslop Court, Georgetown, Ontario, L7G 4J4, Canada.

2.      Respondent Ultra Electronics NSPI, incorporated in Delaware, is an international corporation headquartered in the United Kingdom with offices at 707 Jeffrey Way, Round Rock, TX 78680-0300.  Ultra Electronics NSPI purchased Weed Instrument Company, Inc. which was the original party to Movant's original Sales Representation Agreement.

## II.  VENUE AND JURISDCITION

3.      This petition is filed as an initial application in Austin, Travis County, Texas pursuant to the arbitration terms of the Sales Representation Agreement dated March 24, 2011

---

between the parties.  The arbitration agreement provides that a hearing before the arbitrators is to be conducted in Austin, Texas and that the governing law will be "interpreted in accordance with the laws of the State of Texas, United States of America."  Additionally, diversity jurisdiction provides for venue in federal court.

### III.  THE ARBITRATION AGREEMENT

4.      The parties entered into a written agreement, attached hereto as **Exhibit 1**, with Section 8.7 providing for arbitration of disputes as follows:

**"Arbitration**.  As an express condition to this Agreement, the parties hereto intend and agree that any dispute arising between the parties from or in connection with this Agreement as well as any dispute about the validity of the Agreement shall be finally settled by a Court of Arbitration expressly debarring legal action.

(a)      Court Panel.  The Court of Arbitration shall consist of two arbitrators and one umpire.  Each party shall nominate one arbitrator.  Nominations shall take place not later than four (4) weeks after one party has notified the opposing party in writing of the nomination of its arbitrator and has requested the opposing party to follow suit.  Should the opposing party fail to follow suit within this period, the arbitrator shall be nominated, on application of the other party, by the judge of the United States District Court for the Western District of Texas, sitting in Austin, Texas.

(b)      Umpire.  Both arbitrators shall appoint an umpire four (4) weeks from the date of nomination of the second arbitrator.  The umpire must be qualified to deliver judgment.  Should the arbitrators fail to agree on the person of the Umpire

[sic] within the specified period, the umpire shall be appointed, on application by one of the two arbitrators or one of the two parties, by the judge of the United States District Court of the Western District of Texas, sitting in Austin, Texas.

(c)     Rules of Arbitration.  The arbitration shall be conducted pursuant to the rules of arbitration as promulgated from attorneys.  The arbitration shall be held in Austin, Texas and shall be in accordance with [the] Texas Arbitration Act."

## IV.  THE DISPUTE

5.     Hank Rasanen, owner and president of Henry Controls, Inc., served as the exclusive Canadian sales representative for Ultra Electronics, Nuclear Sensors & Process Instrumentation (hereinafter "Ultra NSPI") (and its predecessor Weed Instrument Company, Inc.) for over seventeen years before his contract was abruptly terminated without cause on or about April 1st, 2013, effective 30 days later.

6.     It is undisputed that nuclear power projects, by their inherent nature, have an extremely long sales cycle and take several years of continuous investment in uncompensated sales effort, time and expense before resulting in customer purchase orders and eventual compensating commissions after shipment of long delivery manufactured products.  Movant's territory was "the country of Canada".  *See* **Exhibit 1 at Exhibit C**.

7.     The Parties entered into a Sales Representation Agreement (hereinafter referred to as the "commissions agreement") attached hereto as Movant's **Exhibit 1**.

8.     Article VII of the commissions agreement states that "In the event either party terminates this Agreement without cause, the commissions on all orders entered by Ultra NSPI

prior to the effective date of termination shall be paid to the Representative in normal time as stated in Paragraph 3.2".

9.      The commission agreement and attached exhibits establish procedures and agreed upon terms for the territory and payment of commissions, as well as the prohibition against Movant's representing competitors.

10.     The instant dispute is an attempt by Ultra NSPI to unjustly enrich itself by benefiting from the years of effort by Movant without paying the commissions due or to become due to him.  The dependency of this dispute is a severe impediment to the collection of potentially millions of dollars of commissions for Movant now and over the next ten years.  Movant claims anticipatory breach, unjust enrichment, breach of contract, and attorneys' fees.

11.     No discovery has taken place and there has not been any activity towards litigating either party's claims or defenses.  No petition, other than this Motion, has been filed by the parties. Therefore, no parties will suffer prejudice from this honorable Court ordering arbitration. As there is no prejudice, this Court should compel arbitration.

## V.  LEGAL ARGUMENTS

12.     This Court should compel arbitration for the following reasons:

a.      **The written contract to arbitrate exists and is enforceable.**  On March 24, 2011, the parties entered into a valid, written contractual agreement, containing an arbitration clause, to pay Movant his commissions "in normal time" as stated in Paragraph 3.2 and Article VII.  The purpose of the agreement was to establish the terms, territory and restrictions, for Movant to serve as the exclusive representative for Ultra NSPI in Canada.

"The courts' role…is first to decide whether the parties made a valid and presently enforceable agreement to arbitrate.  If they did, then the court must decide whether the present disputes fall within the scope of that agreement.  These questions…are sometimes referred to as questions of 'arbitrability.'  If, by answering these questions, the court determines that the present disputes are in fact arbitrable under the parties' agreement, the court must complete its role by ordering the parties to arbitration and leaving it to the arbitrators to resolve those disputes." *G.T. Leach Builders, LLC v. Sapphire V.P.*, L.P, 485 S.W.3d 502, 519-20 (Tex. 2015); *Dealer Comput. Servs.*, 588 F.3d at 886; *Century Indem. Co.*, 584 F.3d at 523; *Donaldson Co. v. Burroughs Diesel, Inc.*, 581 F.3d 726, 730-31 (8th Cir. 2009).  A copy of the agreement is attached as **Exhibit 1**.  "The party seeking arbitration has the initial burden to present evidence of an arbitration agreement.  Once the existence of an arbitration agreement has been established, a presumption attaches favoring arbitration.  The burden then shifts to the opposing party to present evidence that the agreement was procured in an unconscionable manner or induced or procured by fraud or duress; that the other party has waived its right to compel arbitration under the agreement; or that the dispute falls outside the scope of the agreement." *In re Hartigan*, 107 S.W.3d 684, 687-88 (Tex. App.—San Antonio 2003, orig. proceeding).  The Texas Arbitration Act "authorizes, as an independent cause of action, the invoking of a trial court's jurisdiction to compel arbitration.  We find

that [a party's] request to compel arbitration is a claim for relief independent of [movant's] causes of action, and therefore, is 'affirmative relief' under [TRCP] 162. *Quanto Int'l Co. v. Lloyd*, 897 S.W.2 482, 487 (Tex. App.— Houston [1st Dist.] 1995, orig. proceeding). "Once a valid arbitration agreement is established, a 'strong presumption favoring arbitration arises' and we resolve doubts as to the agreement's scope in favor of arbitration. …When determining whether claims fall within the scope of the arbitration agreement, we look to the factual allegations, not the legal claims." *Rachal v. Reitz*, 403 S.W.3d 840, 850 (Tex. 2013).

b.     **The contract is clear and unambiguous.**  The arbitration clause requires the dispute involved between the parties to be submitted to arbitration, and the provision should be enforced.  *Century Indemn. Co.*, 584 F.3d at 555-56.  The arbitration clause is clear and unambiguous.  Both parties are equally bound under the agreement to arbitrate.  Furthermore, Movant has fully performed all duties owed to respondent under the arbitration agreement or is willing to perform any arbitration obligations not yet performed.  There is no adequate remedy at law for respondent's breach of the arbitration agreement.  In the case of *G.T. Leach Builders, LLC v. Sapphire V.P., L.P.*, 458 S.W.3d 502, 520 (Tex. 2015), the Texas Supreme Court outlined the distinctions between the purview of the courts and that of arbitrators:

 [T]he U.S. Supreme Court has recognized a distinction between questions of 'substantive arbitrability'—which courts decide—and 'procedural arbitrability'—which courts must refer to the arbitrators to decide. At 521:

---

[C]ourts should defer to arbitrators to resolve the issue of waiver when waiver concerns limitations periods or waiver of particular claims or defenses, but courts should decide issues of waiver by litigation conduct…At 522:  [However, w]e do not hold that disputes over a contractual deadline in an arbitration agreement will always present questions of procedural arbitrability that arbitrators must decide."

c.  **The Court is Not to Consider the Merits.** The United States Supreme Court prohibits consideration of the merits on a motion to compel. The Supreme Court held that "there is a presumption of arbitrability in the sense that '[a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute.'" *AT&T Tech., Inc. v. Communications Workers of Am.*, 475 U.S. 643, 650, 106 S.Ct. 1415, 1419, 89 L.Ed.2d 648 (1986) (quoting *Steelworkers v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582-83, 80 S.Ct. 1347, 1353, 4 L.Ed.2d 1409 (1960)). In ruling on the arbitrability of a dispute, a court should not decide the merits of the underlying claims. *See AT&T Tech.*, 475 U.S. at 649.

d.  **Demands to Arbitrate have been disregarded by Respondent.**  Movant made his first arbitration demand by letter dated December 21, 2015 sent by certified mail, return receipt requested to both the President of Ultra Electronics and its registered agent. Movant declared his selected arbitrator and requested that Respondent name an arbitrator. Movant sent his second demand to arbitrate on March 23, 2017 since Respondent had failed to provide any documents or proof that no commissions were owed to Movant.  Attached

as **Exhibit 2** are Movant's demands to arbitrate.  The claim is arbitrable and not subject to any legal constraint that renders it nonarbitrable.  *Guyden v. Aetna, Inc.*, 544 F.3d 376, 382 (2d Cir. 2008); *Walton v. Rose Mobile Homes LLC*, 298 F.3d 470, 473 (5th Cir. 2002); *see Mitsubishi Motors Corp. v. Soler Chrysler Plymouth*, Inc., 473 U.W. 614, 628 (1985).  Neither of the parties has waived the opportunity to arbitrate.  Although there was an offer and acceptance to toll the statute of limitations for arbitration between the parties' attorneys, Respondent's counsel later questioned that agreement's terms and demanded to add an additional term prohibiting Movant from filing this motion to compel arbitration in order to absolutely protect Movant's legal rights.  Because this dispute could not be timely resolved, this motion is being filed in an abundance of caution.  To date, no steps to acknowledge the obligation to arbitrate have been made by Respondent.  Instead, Respondent has delayed, excused, and denied Movant's right to commissions instead of providing any documents or proof that such commissions are unearned.  Responded refused, and still refuses, to name an arbitrator or to submit any part of the controversy to arbitration.  Therefore, Respondent has waived its right to select an arbitrator.  Attached hereto as **Exhibit 3** are Respondent's two communications regarding Movant's demand for arbitration and Movant can wait no longer to prove his damages because of the impending statute of limitations.

## VI.  ATTORNEYS' FEES

13.     Movant has retained the law firm of Chamberlain McHaney to represent Movant in this action and has agreed to pay reasonable and necessary attorneys' fees and expenses.  Movant requests reimbursement for reasonable costs.

## VII. THE FEDERAL ARBITRATION ACT ("FAA")

14.     The Federal Arbitration Act (the "FAA" or the "Act") provides that written arbitration agreements are "valid, irrevocable and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2 (1999). The main purpose of the Arbitration Act is "to overcome courts' refusals to enforce agreements to arbitrate." *Allied-Bruce*, 513 U.S. at 270. In passing the FAA, Congress was "motivated first and foremost by a desire to change this [trend],… to enforce [arbitration] agreements into which parties had entered, and to place such agreements 'upon the same footing as other contracts.'" *Id.* at 270-71 (citations omitted) (second alteration in original).

15.     To fulfill the purpose of enforcing arbitration clauses more uniformly throughout the country, Congress established a broad principal of enforceability within the provisions of the FAA. *Doctor's Assoc. v. Casarotto*, 517 U.S. 681, 685 (quoting *Southland Corp. v. Keating*, 465 U.S. 1, 11 (1984)). The Supreme Court has determined that "Congress would not have wanted state and federal courts to reach different outcomes about the validity of arbitration in similar cases." *Allied-Bruce*, 513 U.S. at 72, *citing Southland Corp.*, 465 U.S. at 15-16. Accordingly, "the Court also concluded that the Federal Arbitration Act preempts state law; and it held that state courts cannot apply state statutes that invalidate arbitration agreements." *Id.*  Hence, the outcome should be the same in state and federal court, applying state or federal statutes.

## VII.  CONCLUSION

16.     Movant respectfully requests that this Court compel the arbitration of the dispute by a date certain between the parties. The parties entered into a valid, clear and unambiguous arbitration agreement requiring arbitration of claims.  The Texas Arbitration Act, as well as the

---

Federal Arbitration Act, uniformly hold that the arbitrability of disputes agreed upon in a written contract or agreement must be enforced.  Moreover, Texas law consistently enforces the clear and unambiguous language of contracts, particularly broad arbitration provisions such as that presented here. In this case, the clear and unambiguous contractual provision requires arbitration of "any disputes arising between the parties from or in connection with this Agreement as well as any dispute about the validity of the Agreement…."  Pursuant to both the Texas Arbitration Act and the Federal Arbitration Act, this dispute should immediately be submitted to binding arbitration.

Respectfully submitted,

SUSAN G. MORRISON
CHAMBERLAIN ♦ McHANEY
301 Congress Ave., Suite 2100
Austin, Texas 78701
(512) 474-99124; (512) 474-8582 (fax)


By: */s/ Susan G. Morrison*             
     Susan G. Morrison
     Texas Bar No. 14524700
     smorrison@CHMC-law.com

**Attorneys for Claimant/Movant**


## CERTIFICATE OF SERVICE

I hereby certify that on March 31, 2017, a true and correct copy of the foregoing document was electronically filed using the CM/ECF system, which will send notification of this filing to all counsel of record who are registered to receive such notifications, and has been served upon Respondent as indicated below.

Glenn Pogust
ARNOLD & PORTER KAYE SCHOLER LLP
250 West 55th Street
New York, NY 10019-9710
(212) 836-7801; (212)836-6301(fax)
Glenn.Pogust@apks.com
*via e-mail*


       */s/ Susan G. Morrison*             
       Susan G. Morrison

# EXHIBIT 1



March 24, 2011

**Ultra Electronics**

NUCLEAR SENSORS &
PROCESS INSTRUMENTATION
707 Jeffrey Way
PO Box 300
Round Rock, TX 78680-0300
USA

Henry Controls Inc.
32 Heslop Court
Georgetown, Ontario
Canada L7G 4J4
Attn: Hank Rasanen

Tel  +1 512 434 2800
Fax  +1 512 434 2801

**www.ultra-nspi.com**

**RE: Variation to your Sales Representation Agreement**

Dear Mr. Rasanen,

Due to the change in our company ownership, we are making the following changes to our Sales Rep Agreement:

1. We are updating the agreement to reflect our new trading name, Ultra Electronics, Nuclear Sensors & Process Instrumentation

2. Compliance with the UK Bribery Act. As we have a UK parent company, and you legally represent us in your territory per this agreement, we both must agree to the change in terms as described in the agreement. This is very similar to the US Foreign Corrupt Practices Act but does differ from it.

This letter agreement confirms in writing, in accordance with the new Article IX of the Agreement, that the parties to the Agreement have agreed to vary its terms as set out below. Unless otherwise defined in this letter agreement, all terms defined in the Agreement shall have the same meanings in this document.

**It is hereby agreed as follows:**

The following clause be inserted in the Agreement as a new clause [Article IX]:

**Anti-Bribery and Corruption; Anti-Money Laundering**

**Section 9.1** The Representative understands and acknowledges that Ultra NSPI does not authorize and will not tolerate or authorize bribery, or any other corrupt activities, in connection with the conduct of its business.

**Section 9.2** The Representative represents and warrants that:

(a) the Representative has not, whether directly or indirectly, authorized, offered, promised or given a financial or other advantage (including without limitation any money, contribution, gift, bribe, rebate, payoff, influence payment, kickback, loan, reward, advantage or anything of value, including any benefit of any kind) and will not, whether directly or indirectly, authorize, offer, promise or give such financial or other advantage:



Confidential
Page 1 of 4

Ultra Electronics
Nuclear Sensors & Process Instrumentation is
a business name of Weed Instrument Co., Inc.



(i)     to another person with the intention to induce a person to perform improperly a relevant function or activity (including any function of a public nature, any activity connected with business, any activity performed in the course of a person's employment or any activity performed by or on behalf of a body of persons (whether corporate or unincorporated)),

(ii)    to another person with the intention to reward a person for the improper performance of such a function or activity;

(iii)   to another person with the knowledge or belief that the acceptance of the advantage would itself constitute the improper performance of such a function or activity;

(iv)   to a government official (or his representative), any political party or party official, any candidate for political office, with the intention of influencing such official, party, or candidate in its or his official capacity to do or omit to do an act in violation of the lawful duty of such party, official, or candidate and with the intention of obtaining or retaining business, or to secure any improper advantage.;

(v)    to another person, while knowing or being aware of the high probability that all or a portion of such money or thing of value will be offered, given, or promised, directly or indirectly, as a bribe or kickback

(vi)   in violation of any law (including, without limitation, the law of the Territory and English law) or

(vii)  to a foreign public official or to any person for the benefit of a foreign public official (a) as consideration for an act or omission by the official in connection with the performance of the official's duties or functions; or (b) to induce the official to use his or her position to influence any acts or decisions of the foreign state or public international organization for which the official performs duties or functions.

(b)    to the extent applicable, the Representative shall have received all documentation and other information required by, and complied in all material respects with, "know-your-customer" and anti money-laundering rules and regulations.

(c)    the Representative has not, and will not, establish or maintain any fund or asset that has not been accurately recorded in the books and records of the Representative.

For the purposes of this clause 9.2, terms used shall have the following meanings:-

(a) 'government official' shall include, but shall not be limited to, an individual who is employed or appointed by a public body and any person acting in an official capacity.

(b) 'foreign public official' means (i) a person who holds a legislative, administrative or judicial position of a foreign state; (ii) a person who performs public duties or functions for a foreign state, including a person employed by a board, commission, corporation or other body or authority that is established to perform a duty or function on behalf of the foreign state, or is performing such a duty or function; and (iii) an official or agent of a public international organization that is formed by two or more states or governments, or by two or more such public international organizations;



(c) 'public body' shall include, but shall not be limited to, any government, including any department, agency or instrumentality of any such government, the armed forces of any government, any other national, regional or local governing or administrative body, and any other body which exercises authority over or in relation to the public at large in any jurisdiction, any public agency or public enterprise, or any public international organisation; and

(d) 'foreign state' means a country other than that in which Ultra NSPI is resident, and includes (i) any political subdivision of that country; (ii) the government, and any department or branch, of that country or of a political subdivision of that country; and (iii) any agency of that country or of a political subdivision of that country.

**Section 9.3**   The Representative will procure that each and every officer, employee and intermediary employed or instructed by the Representative who will perform services under, or in connection with, this Agreement or otherwise for the benefit of Ultra NSPI (or any of the companies in the Ultra Electronics Holdings plc group) will sign a declaration confirming that they have read and understood this clause and that they will abide by it.

**Section 9.4**   Audit Rights

(a)     The Representative shall maintain proper accounts and records recording all payments made and received by the Representative in connection with its performance of its duties under this Agreement.

(b)     The Representative will allow Ultra NSPI (either through its employees or through an independent auditor) to access the Representative's accounts and records (including supporting documentation such as invoices and bank statements) in order to satisfy itself that neither the Representative nor its officers, employees or intermediaries have paid bribes or otherwise acted corruptly or dishonestly in connection with the provision by the Representative of services under this Agreement, during the term of this Agreement, provided that any such access shall be on not less than two (2) days' written notice at any time during normal business hours for the purposes of auditing or otherwise inspecting the accounts and records.

(c)     The Representative shall afford to Ultra NSPI all reasonable assistance in the carrying out of any such audit.  Ultra NSPI and its auditors shall ensure that any information obtained in the course of the audit concerning the Representative's business is treated as confidential information according to the provisions of clause 14 and not used for any purpose other than the proper conduct of the audit concerned.

**Section 9.5**  If Ultra NSPI has reasonable grounds to suspect that the Representative or any of its officers, employees or intermediaries has paid any bribes or otherwise acted corruptly or dishonestly in connection with the provision by the Representative of services under this Agreement, it may terminate this Agreement by reason of fundamental breach of contract by the Representative.

The Agreement shall be deemed varied with effect from the date of this letter.

All other provisions of the Agreement will remain in full force and effect.  In the event of any conflict between this letter agreement and the provisions of the Agreement, the terms of this document shall prevail.



To the extent that any provision of this letter agreement is found by any court or competent authority to be invalid, unlawful or unenforceable in any jurisdiction, that provision shall be deemed not to be a part of this letter agreement, it shall not affect the enforceability of the remainder of this letter agreement nor shall it affect the validity, lawfulness or enforceability of that provision in any other jurisdiction.

This letter agreement shall be governed by and construed in accordance with US law. Each of the parties irrevocably submits for all purposes in connection with this letter agreement to the exclusive jurisdiction of the courts of US.

Please indicate your agreement to the terms and conditions of this letter agreement by signing both copies and returning one copy of this letter to me.

Yours sincerely,

**ULTRA ELECTRONICS, NUCLEAR**
**SENSORS & PROCESS INSTRUMENTATION**

By: _____
    Joe Cheatham
    Vice President, Sales and Marketing

Date: _____

**ATTEST:**

By: _____

Date: _____

We hereby agree to vary the terms of the Agreement as set out in this letter.

**HENRY CONTROLS INC.**

By: _____

Title: _____PRESIDENT_____

Date: _____JULY 12, 2011_____

**Nuclear Representative No.: 81025**

**ATTEST:**

By: _____

Date: _____

DEBRA CHARALAMBIDES
FINANCIAL SERVICES MANAGER
905-873-2628



## SALES REPRESENTATION AGREEMENT

STATE OF TEXAS                     §
                                   §          **KNOW ALL MEN BY THESE PRESENT:**
**COUNTY OF WILLIAMSON**           §

This Agreement is made and entered into this 24th day of March, 2011 in the City of Round Rock, State of Texas, County of Williamson, by and between the Nuclear Division, **ULTRA ELECTRONICS, NUCLEAR SENSORS & PROCESS INSTRUMENTATION**, a Delaware corporation, whose principal office and place of business is **707 Jeffrey Way, Round Rock, Texas, 78665**, hereinafter referred to as "**Ultra NSPI**", and **HENRY CONTROLS INC.,** whose principal office and place of business is **32 Heslop Court, Georgetown, Ontario, Canada L7G 4J4** referred to as "**Representative**":

### WITNESSETH:

In consideration of the mutual promises and the sums to be paid to Representative as hereinafter set forth, the parties agree as follows:

### ARTICLE I
### DEFINITIONS

**Section 1.1 Definitions.**  As used in this Agreement, the following terms shall have the following meanings:

(a)     Currency: The Currency for payment hereunder shall be United States Dollars.

(b)     "Home Country": Refers to the domicile of the "Ultra NSPI" which is the United States of America.

(c)     "Host Country": The term "Host Country" refers to the country within which "Representative" maintains its principal place of business or in which it primarily represents "Ultra NSPI".

(d)     Intellectual Property: All "Ultra NSPI" Patents including; technological, scientific, and marking information, knowledge, data, know-how, formulae, inventions, specifications, particulars and secrets; operational instructions; rights and intellectual property of every kind including copyrights, brand names, trade names, Trademarks, technical assistance and rights and intellectual property of every kind held by "Ultra NSPI" whether on the date this "Agreement" becomes effective or thereafter and Intellectual Property as that term is understood in the official English Text of the Paris Convention for the Protection of Industrial Property.

(e)     List Price: The price is determined by "Ultra NSPI" which shall be the quoted price conveyed to the customer by "Representative" of each Product to be sold hereunder.  In those cases when "Representative chooses to act as a distributor and imports for resell to the customer, then the distributor shall have control of computing the quoted price conveyed to the customer over and above the "Ultra NSPI's" quoted price.



(f)     Net Sales: The gross amount invoiced to the customer by "Ultra NSPI" on sales of the Products to be sold hereunder minus returns on items purchased, dealer discounts, cash discounts and any applicable taxes.

(g)     Products: Products shall be those Products to be sold hereunder as more particularly listed on Exhibit "A" attached hereto and made a part hereof.

(h)     Territory: the Territory of this Agreement shall be as defined in Exhibit "C" attached hereto and made a part hereof.

## ARTICLE II
## Grant of Authority

**Section 2.1 Rights.**  Ultra NSPI hereby grants to the Representative rights to market and solicit orders for the sale of Ultra NSPI products in the territory and for the industries and markets as described in Section 2.2 and 2.3, respectively.   Representative hereby accepts such appointment and agrees to solicit orders and promote said products upon the terms and conditions herein set forth.

**Section 2.2 Territory.**   The geographical territory of the Representative as identified in Exhibit "A."

**Section 2.3 Industries and Markets.**   Within the foregoing territory, the Representative shall call upon and solicit orders from prospective customers as described in Exhibit "B".   The Representative agrees that excluded accounts/markets as defined in Exhibit "B" are to be excluded from this Agreement, and Representative will not call upon such accounts/markets and will earn no commission for sales made by Ultra NSPI to such accounts/markets.

**Section 2.4 Products.**   Representative shall have the right within the territory shown herein to promote the sale of all Ultra NSPI products into each of the markets identified in Exhibit "B".

## ARTICLE III
## Commission

**Section 3.1 Policy.**   Actual commissions will be paid in accordance with the "Schedule of Commissions" attached hereto as Exhibit "C" and incorporated herein for all purposes, subject to the further terms and provisions of this Agreement.   Ultra NSPI shall deduct from any commissions due the Representative an amount equivalent to commissions previously paid or credited on sales of Ultra NSPI products arising from: (a) cancellation of all or any part of an order by a customer, and (b) allowances or back charges credited to a customer for any reason.

Determination of the appropriate amount for allowances or back charges shall be within Ultra NSPI's sole discretion.   Ultra NSPI shall have the right and sole discretion to accept or reject any and all orders from customers within the Representative's territory.   Ultra NSPI shall, upon acceptance of an offer solicited by the Representative, send an acknowledgement to the Representative.   All sales shall be at prices and upon terms established by Ultra NSPI, which may, in its sole discretion alter, amend, or establish terms and conditions of sale, discount rates, prices, delivery, packing charges, and methods of payment.   The Representative shall furnish with each request for price quotation, full customer information to Ultra NSPI, giving customer, address, application of unit, contact person at the customer's facility, and all other pertinent information.   Ultra NSPI shall have the right at any time to deal directly with the customer.   All



quotations shall be issued to the particular customer, with a copy to the Representative. Orders shall be made directly by the customer to Ultra NSPI.

**Section 3.2 Payment of Commissions.** Commissions shall be paid on the basis of net prices. Ultra NSPI will pay the Representative by the third week of each fiscal month for any payment received in the previous fiscal month on which the Representative has earned a commission. Any delay in payment or non-payment of Ultra NSPI invoices by the customer will delay or prevent payment of the commission. All payments for commissions shall be payable by check drawn to the order of the Representative and mailed to such address as the Representative designates in writing. Commission paid on products shipped and subsequently returned by the customer for credit shall either be deducted from any subsequent commissions due the Representative as set forth in Section 3.1 hereof, or shall be repaid by the Representative to Ultra NSPI at Ultra NSPI's option on and upon Ultra NSPI's demand.

**Section 3.3 Territorial Apportionment of Commission.** Commissions on shipments into the Representative's territory resulting from orders originated by representatives in other territories, and on shipments into such other territories as a result of Representative's efforts, shall be apportioned in an equitable manner, as set forth on attached Exhibit "D". Insignificant amounts may be ignored.

**Section 3.4 Excluded Commissions.** Ultra NSPI shall not be liable for the payment on a commission of any of the following:

    (a)    Engineering time charged to a customer for engineering modification done at the customer's request.

    (b)    Alterations to previously sold units done at the customer's request.

    (c)    Defective products replaced by Ultra NSPI for whatever reason.

    (d)    Modification(s) made to previously delivered equipment.

    (e)    Engineering costs charged to a customer for preparation of submittals, such as drawings, test procedures, quality assurance activities, purchasing and expediting, when those charges are specifically identified by Ultra NSPI to the customer and accepted by the customer.

    (f)    Field engineering service charges, installation and start-up.

    (g)    Cancellation and restocking charges.

    (h)    Expediting charges.

    (i)    Testing charges (to the extent not included in (e) above).

    (j)    Calibration charges when itemized.

    (k)    Documentation charges when itemized.



# ARTICLE IV
## Obligations of Representative

**Section 4.1 Best Efforts.**  The Representative agrees to use its best efforts to solicit orders for Ultra NSPI products and equipment and to actively promote the sale thereof, with all sales being subject to Ultra NSPI's prior acceptance at its home office in Round Rock, Texas.

**Section 4.2 Adherence to Price List.**  The Representative shall adhere strictly to Ultra NSPI price lists, including the quantity discounts and schedules set forth therein, and to Ultra NSPI's Standard Terms and Conditions, which includes all warranties, except when Ultra NSPI shall expressly consent in writing to deviations.  In cases where there is no published price for a product or service offered by Ultra NSPI, Representative shall consult with Ultra NSPI and offer such product or service at terms and at a price specifically quoted or authorized by Ultra NSPI.

**Section 4.3 Assisting Customers.**  The Representative shall assist prospective customers in collecting and assembling necessary technical and engineering data for use in preparing proposals, quotations, and bids.  The Representative shall supply Ultra NSPI with copies of all details of engineering, scheduling, and any other pertinent details necessary for proper customer relations.

**Section 4.4 Transmittal of Proposals.**  The Representative shall transmit all proposals, quotations, and bids promptly and expeditiously to customers and follow through faithfully with such sales effort under Ultra NSPI's direction.

**Section 4.5 Cooperation.**  The Representative shall cooperate with Ultra NSPI by preparing and submitting market and specific customer information in such manner as Ultra NSPI may reasonable require.  The Representative shall furnish Ultra NSPI with the Representative's customer list at such intervals as may be necessary to maintain a current customer list with Ultra NSPI.

**Section 4.6 Follow-up.**  The Representative shall continue to call upon customers, offer technical assistance during installation, evaluation, or whenever required and otherwise cooperate with all customers after sales are made in order to promote good will for Ultra NSPI through assisting customers in achieving maximum benefit from Ultra NSPI's products and equipment.

**Section 4.7 Other Products.**  The Representative shall refrain from handling, promoting, or marketing any product, equipment or service which in Ultra NSPI's judgment might be wholly or partly in competition with Ultra NSPI products, equipment or services, unless specifically authorized, in writing, by Ultra NSPI.

**Section 4.8 Return of Materials.**  The Representative shall return to Ultra NSPI all reports, records, files, forms, advertising material, customer lists, and all other literature and property of every nature obtained from Ultra NSPI upon any termination of this Agreement or upon the written request of Ultra NSPI.



**Section 4.9 Confidence.**  The Representative shall accept in trust and hold in confidence all of Ultra NSPI's information, knowledge, and data, including customer lists and marketing data developed by or for Ultra NSPI, and shall not disclose or discuss such confidential information or material which is of a proprietary or confidential nature with any party other than Ultra NSPI during the life of this Agreement and thereafter, except with Ultra NSPI's prior written consent.

**Section 4.10 Training Session.**  The Representative shall attend any national or regional sales meetings or training sessions held by Ultra NSPI.

**Section 4.11 Rights of Exclusive Territory.**  The Representative shall solicit sales only in its territory and from customers in its assigned industry(ies) and market(s) and shall not promote Ultra NSPI products in other territories or to customers not in its assigned industry(ies) and market(s) unless specifically authorized in writing by Ultra NSPI.

**Section 4.12 Assistance.**  The Representative shall assist Ultra NSPI in promotion of Ultra NSPI products and participate in any trade show, symposia, and other similar showings within the Representative's territory.   Ultra NSPI will assist Representative with demonstration equipment and personnel, if practical, in trade shows and symposias.

**Section 4.13 Expenses.**  Except as otherwise specifically set forth above, all of the obligations of the Representative to be performed hereunder shall be performed at the sole expense of the Representative.

**Section 4.14 Representative Sales Staff.**  The Representative shall give Ultra NSPI written notice of all changes in the sales staff of the Representative's organization. The "Manufacturer" shall have no obligation to any of the employees of "Representative" in the event of termination for any reason whatsoever nor shall "Manufacturer" have any liability to them for any claims against the "Representative" for compensation or unlawful termination, or any other claimed entitlement.   Any such matters are exclusively between the "Representative" and its employees.

**Section 4.15 Customer's Financial Status.**  Upon request, representatives shall furnish to Ultra NSPI any information, which it may have relating to a customer's financial standing.

**Section 4.16 Collection.**  Upon request, shall assist in debt collection when required.

### ARTICLE V
### Obligations of Ultra NSPI

**Section 5.1 Cooperation.**  Ultra NSPI agrees to cooperate fully with the Representative and to take all reasonable steps to assist the Representative in connection with the fulfillment of its obligations hereunder.

**Section 5.2 Demonstration Equipment.**  "Ultra NSPI" may furnish to the "Representative" demonstration equipment to market Products to be sold hereunder.   Title to such equipment and accessories shall remain with "Ultra NSPI" at all time unless purchased by "Representative".  The costs of transportation of such demonstration equipment shall be borne by "Ultra NSPI" and "Representative" will take steps necessary including the securing of any necessary import licenses to permit demonstration equipment to enter the Territory.  "Representative" will follow instructions given by "Ultra NSPI" relating to the disposition of such equipment to customer and shall return the equipment upon demand at its expense.



in the same condition in which it was received, reasonable wear and tear accepted.  In the event of the return of the demonstration equipment to the "Ultra NSPI", "Representative" will be responsible for securing any necessary export licenses pertaining to the demonstration equipment and shall bear the cost of transporting same to "Ultra NSPI".

**Section 5.3 Promotional Materials.**  Ultra NSPI shall supply the Representative with sufficient amount of sales and promotional materials and items, technical information, and applications data regarding Ultra NSPI products and equipment as may be required by the Representative. Upon termination "Representative" will return any unused promotional materials, technical information and applications data to "Manufacturer".  "Representative" shall translate any such technical information, promotional materials and applications data at it's expense and "Manufacturer" shall have the right to review, approve and reject any such translations before they are entered into the market place of the Territory.

**Section 5.4 Inquiries.**  "Ultra NSPI" shall keep the "Representative" fully informed of any inquiries and proposals made by or to customers in the "Representative's" Territory.

**Section 5.5 National Advertising.**  Ultra NSPI shall be responsible for all national advertising of Ultra NSPI products and equipment.

**Section 5.6 Warranties.**  Ultra NSPI shall perform all of the obligations and honor its warranties as set out in Ultra NSPI's current Standard Terms and Conditions, as the same may be amended from time to time.

**Section 5.7 Field Support.**  Ultra NSPI shall furnish a reasonable amount of field sales support to supplement the Representative's efforts.  In the event employees of "Representative" require any training in the Home Country.  "Representative" shall bear the expense of transportation for them to the Home Country, and "Ultra NSPI" shall be responsible for room and board of any such employees of "Representative" in the Home Country.

### ARTICLE VI
### PATENT, TRADEMARK RIGHTS AND INTELLECTUAL PROPERTY,
### EXCLUSIVE PROPERTY OF ULTRA NSPI

**Section 6.1 Ownership of Intellectual Property.**  Notwithstanding the use by "Representative" of "Ultra NSPI's" Patents, Trademarks, Intellectual Property, and any other brand names or other technical assistance in the Territory, it is hereby expressly agreed that all such Intellectual property, Patents and Trademarks shall remain the exclusive property of "Ultra NSPI".  "Representative" agrees to use and display "Ultra NSPI's" Trademarks at all times in such a manner as to exclude any doubt of "Ultra NSPI's" ownership and to submit to "Ultra NSPI" for its approval the intended display in any fashion of "Ultra NSPI's" Trademarks for this express approval prior to any such display thereof.

**Section 6.2 Notice of Infringement.**  "Representative" shall notify "Ultra NSPI" promptly of any infringement of "Ultra NSPI's" Patents and Trademarks in the Territory and shall provide "Ultra NSPI" with any available evidence thereof.  "Ultra NSPI" may, at its discretion, take legal steps to enforce its Patent and Trademark rights, but is under no obligation to do so.



**Section 6.3 Cessation of Use of Intellectual Property.** Upon expiration or termination of this Agreement for any reason, "Representative" shall have no further rights of any kind to use any of the Intellectual Property, Patents, and Trademarks in the Territory or elsewhere and immediately shall discontinue using same in any manner whatsoever. Immediately upon termination, "Representative" shall, at no cost or expense to "Ultra NSPI", destroy or deliver to "Ultra NSPI" at its option any or all advertising, promotional or other materials in "Representative's" possession which bear any of the Intellectual Property, Patents, or Trademarks.

**Section 6.4 Assistance with Intellectual Property.** "Representative" shall assist "Ultra NSPI", at any time during the validity of this Agreement in the preparation, execution and delivery of any disclosures, patent applications or documents within the scope of this Agreement.

### ARTICLE VII
### Terms of Agreement

This agreement shall continue in full force and effect from the date of execution hereof and for one (1) year thereafter unless earlier terminated as specified hereinafter or unless otherwise agreed upon in writing, and shall be renewed automatically on the anniversary date unless terminated as hereinafter provided. In the event the Representative violates any term of this Agreement and after receiving notice of such violation from Ultra NSPI fails to terminate this Agreement immediately by written notice to the Representative effective when such notice is given; provided, however, that if Representative shall engage in the marketing or sale of a product which is in direct or indirect competition with Ultra NSPI's products, then Ultra NSPI may terminate this Agreement immediately by written notice to the Representative effective when such notice is mailed. The failure to enforce any term of this agreement shall not be deemed a waiver of such provision by Ultra NSPI. Either party may terminate this Agreement at any time with or without cause, on the giving of thirty (30) days' written notice to the other party which notice shall be effective when mailed. In the event either party terminates this Agreement without cause, the commissions on all orders entered by Ultra NSPI prior to the effective date of termination shall be paid to the Representative in normal time as stated in Paragraph 3.2. In the event Ultra NSPI terminates this Agreement with cause, the Representative shall forfeit all commissions not yet paid.

### ARTICLE VIII
### MISCELLANEOUS

**Section 8.1 Amendments.** Only an instrument in writing signed by both of the parties hereto can amend this Agreement.

**Section 8.2 Assignments.** This Agreement is personal in it character, and shall not be assignable by the Representative without the prior written consent of Ultra NSPI, which consent Ultra NSPI shall have no obligation to grant.

**Section 8.3 Relationship of Parties.** Ultra NSPI reserves no control over the Representative or any of its employees, agents, or representatives, as to the method of performance of its obligations hereunder, so long as they are consistent with the general guidelines of honesty and good faith set forth by Ultra NSPI. The manner, methods, and persons used by the Representative in performed such obligations are for the determination of the Representative. The Representative shall limit its activities to the performance of the obligations herein specified, and the Representative shall not have any power to



bind Ultra NSPI by contract or otherwise.   Ultra NSPI reserves no control whatsoever over the employment, discharge, compensation of, or services rendered by an employee, agent, or representative of the Representative.  Ultra NSPI shall not be responsible for the acts or omissions of said employees, Ultra NSPI's agent, and this agreement shall be construed in light of this intention.  Neither party shall be bound by oral representations or negotiations prior to the date of the execution hereof or thereafter unless reduced to a writing signed by both parties.

**Section 8.4 Entire Agreement.**   This agreement sets forth the entire agreement between the parties hereto relating to the subject matters hereof and supersedes all prior written or oral agreements and understandings, and neither party shall be bound by oral representations or negotiations prior to the date of the execution hereof or thereafter unless reduced to a writing signed by both parties.

**Section 8.5 Governing Law.**   As relating to this Agreement the parties agree to abide by all applicable laws and regulations of the U.S. Government including, but not limited to, the export regulations of the Department of Commerce, the Treasury Department guidelines regarding international boycotts and the Freight Corrupt Practices Act of 1977, which laws and regulations shall supersede any conflicting laws and regulations of any other country in connection with activities performed under this Agreement.  Any party found in violation of said laws and regulations shall indemnify and hold the other party harmless from and against all claims, damages, losses and expenses (including reasonable attorneys' fees), not including special, incidental or consequential damages, arising out of or resulting from any such violation.

This Agreement shall be interpreted in accordance with the laws of the State of Texas, United States of America.

For legal purposes, the domicile of "Ultra NSPI" will be in Round Rock, Texas, U.S.A. and the domicile of "Representative" will be in Georgetown, Ontario, Canada.

**Section 8.6 Notices.**   All notices shall be deemed to have been duly given if in writing, and deposited in the mail addressed to the parties' addresses as shown at the beginning of this Agreement or to such other address as either party may request in writing.

**Section 8.7 Arbitration.**   As an express condition to this Agreement, the parties hereto intend and agree that any dispute arising between the parties from or in connection with this Agreement as well as any dispute about the validity of this Agreement shall be finally settled by a Court of Arbitration expressly debarring legal action.

(a)     Court Panel.  The Court of Arbitration shall consist of two arbitrators and one umpire. Each party shall nominate one arbitrator.  Nominations shall take place not later than four (4) weeks after one party has notified the opposing party in writing of the nomination of its arbitrator and has requested the opposing party to follow suit.  Should the opposing party fail to follow suit within this period, the arbitrator shall be nominated, on application of the other party, by the judge of the United States District Court for the Western District of Texas,  sitting in Austin, Texas.



(b)     Umpire.   Both arbitrators shall appoint an umpire four (4) weeks from the date of nomination of the second arbitrator.   The umpire must be qualified to deliver judgment. Should the arbitrators fail to agree  on the person of the Umpire within the specified period, the umpire shall be appointed, on application by one of the two arbitrators or one of the two parties, by the judge of the United States District Court for the Western District of Texas, sitting in Austin, Texas.

(c)     Rules of Arbitration.  The arbitration shall be conducted pursuant to the rules of arbitration as promulgated from attorneys.  The arbitration shall be held in Austin, Texas and shall be in accordance with Texas Arbitration Act.

**Section 8.8 Invalid or Unenforceable Provisions.**  If any provision of this Agreement be found or declared to be invalid or unenforceable by any court or other competent authority having jurisdiction, such finding or declaration shall not invalidate any other provision hereof, and this Agreement shall thereafter continue in full force and effect except that such provisions shall be deemed deleted to the same extend as if they had never existed.

**Section 8.9 Waiver.**  No consent or waiver by a party hereto of any breach or default by any other party hereunder shall be deemed or construed to be a consent of a waiver of any other breach or default hereunder.

**Section 8.10 Non-competition.**  During the term of this Agreement, "Representative" shall not enter into any negotiations with competitors of "Ultra NSPI" for the purpose of sale of products competing with the products without the written consent of "Ultra NSPI".   Should the "Representative" plan the additional manufacture or sale of products competing with the Products, the "Representative" will consult "Ultra NSPI".

**Section 8.11 Headings.**  The headings used in this Agreement are used for administrative purposes and ease of reference only and do not constitute substantive matters to be considered in construing the terms of this Agreement.

**Section 8.12 Governing Language.**  Irrespective of any translations of this Agreement into other languages, the English version shall be binding in all cases of deviations and disputes on interpretation.

**Section 8.13 Counterparts.**  This Agreement may be executed in any number of counterparts and each of such counterparts shall, for all purposes, be deemed to be an original.

**Section 8.14 Time of Essence.**  Time is of the essence to this Agreement.

**Section 8.15 Export Licenses.**  Ultra NSPI's performance of its obligations hereunder is subject to its ability to obtain any applicable export licenses from the United States Government under its Export Administration Act or other applicable United States export rules and regulations.  In the event of its inability to obtain such export license for the export of Products hereunder, it shall not be liable for any loss, damage, detention, claim for commission by "Representative" or delay in arising from such cause.



## ARTICLE IX
## Anti-Bribery and Corruption; Anti-Money Laundering

**Section 9.1** The Representative understands and acknowledges that Ultra NSPI does not authorize and will not tolerate or authorize bribery, or any other corrupt activities, in connection with the conduct of its business.

**Section 9.2** The Representative represents and warrants that:

(a) the Representative has not, whether directly or indirectly, authorized, offered, promised or given a financial or other advantage (including without limitation any money, contribution, gift, bribe, rebate, payoff, influence payment, kickback, loan, reward, advantage or anything of value, including any benefit of any kind) and will not, whether directly or indirectly, authorize, offer, promise or give such financial or other advantage:

  (i) to another person with the intention to induce a person to perform improperly a relevant function or activity (including any function of a public nature, any activity connected with business, any activity performed in the course of a person's employment or any activity performed by or on behalf of a body of persons (whether corporate or unincorporated)),

  (ii) to another person with the intention to reward a person for the improper performance of such a function or activity;

  (iii) to another person with the knowledge or belief that the acceptance of the advantage would itself constitute the improper performance of such a function or activity;

  (iv) to a government official (or his representative), any political party or party official, any candidate for political office, with the intention of influencing such official, party, or candidate in its or his official capacity to do or omit to do an act in violation of the lawful duty of such party, official, or candidate and with the intention of obtaining or retaining business, or to secure any improper advantage.;

  (v) to another person, while knowing or being aware of the high probability that all or a portion of such money or thing of value will be offered, given, or promised, directly or indirectly, as a bribe or kickback

  (vi) in violation of any law (including, without limitation, the law of the Territory and English law) or

  (vii) to a foreign public official or to any person for the benefit of a foreign public official (a) as consideration for an act or omission by the official in connection with the performance of the official's duties or functions; or (b) to induce the official to use his or her position to influence any acts or decisions of the foreign state or public international organization for which the official performs duties or functions.



(b)     to the extent applicable, the Representative shall have received all documentation and other information required by, and complied in all material respects with, "know-your-customer" and anti money-laundering rules and regulations.

(c)     the Representative has not, and will not, establish or maintain any fund or asset that has not been accurately recorded in the books and records of the Representative.

For the purposes of this clause 9.2, terms used shall have the following meanings:-

(a)'government official' shall include, but shall not be limited to, an individual who is employed or appointed by a public body and any person acting in an official capacity.

(b) 'foreign public official' means (i) a person who holds a legislative, administrative or judicial position of a foreign state; (ii) a person who performs public duties or functions for a foreign state, including a person employed by a board, commission, corporation or other body or authority that is established to perform a duty or function on behalf of the foreign state, or is performing such a duty or function; and (iii) an official or agent of a public international organization that is formed by two or more states or governments, or by two or more such public international organizations;

(c) 'public body' shall include, but shall not be limited to, any government, including any department, agency or instrumentality of any such government, the armed forces of any government, any other national, regional or local governing or administrative body, and any other body which exercises authority over or in relation to the public at large in any jurisdiction, any public agency or public enterprise, or any public international organisation; and

(d) 'foreign state' means a country other than that in which Ultra NSPI is resident, and includes (i) any political subdivision of that country; (ii) the government, and any department or branch, of that country or of a political subdivision of that country; and (iii) any agency of that country or of a political subdivision of that country.

**Section  9.3**    The Representative will procure that each and every officer, employee and intermediary employed or instructed by the Representative who will perform services under, or in connection with, this Agreement or otherwise for the benefit of Ultra NSPI (or any of the companies in the Ultra Electronics Holdings plc group) will sign a declaration confirming that they have read and understood this clause and that they will abide by it.

**Section 9.4  Audit Rights**

(a)     The Representative shall maintain proper accounts and records recording all payments made and received by the Representative in connection with its performance of its duties under this Agreement.

(b)     The Representative will allow Ultra NSPI (either through its employees or through an independent auditor) to access the Representative's accounts and records (including supporting documentation such as invoices and bank statements) in order to satisfy itself that neither the Representative nor its officers, employees or intermediaries have paid bribes or otherwise acted corruptly or dishonestly in connection with the provision by the



Representative of services under this Agreement, during the term of this Agreement, provided that any such access shall be on not less than two (2) days' written notice at any time during normal business hours for the purposes of auditing or otherwise inspecting the accounts and records.

(c) The Representative shall afford to Ultra NSPI all reasonable assistance in the carrying out of any such audit. Ultra NSPI and its auditors shall ensure that any information obtained in the course of the audit concerning the Representative's business is treated as confidential information according to the provisions of clause 14 and not used for any purpose other than the proper conduct of the audit concerned.

**Section 9.5** If Ultra NSPI has reasonable grounds to suspect that the Representative or any of its officers, employees or intermediaries has paid any bribes or otherwise acted corruptly or dishonestly in connection with the provision by the Representative of services under this Agreement, it may terminate this Agreement by reason of fundamental breach of contract by the Representative.

**IN WITNESS WHEREOF**, the parties hereto have caused the due execution hereof by their respective duly authorized representatives as the 24th day of March, 2011.

**ULTRA ELECTRONICS, NUCLEAR
SENSORS & PROCESS INSTRUMENTATION**

By: _____
    Joe Cheatham
    Vice President, Sales and Marketing

Date: _____

**HENRY CONTROLS INC.**

By: _____ HA Kasanen, P.Eng.

Title: _____ PRESIDENT

Date: _____ JULY 12, 2011

**Nuclear Representative No.: 81025**

**ATTEST:**

By: _____

Date: _____

**ATTEST:**

By: _____

Date: _____ July 12/11

DEBRA CHARALAMBIDES
FINANCIAL SERVICES MANAGER
905-873-2625



**EXHIBIT "A"**
**TERRITORY AND LOCATION**

**THIS EXHIBIT SPECIFIES THE TERRITORY FOR WHICH THE REPRESENTATIVE IS RESPONSIBLE.**

**TERRITORY SHALL BE:** The country of Canada

**EXCEPTIONS:** None



**EXHIBIT "B"**
**MARKETS AND PRODUCT LINES**

1.　MARKETS INCLUDED BY THIS CONTRACT:
　　(N) – NUCLEAR

　　(a)　1E Safety related instrumentation applications.　These products require the supplier to have a nuclear quality assurance program.　There are occasional applications for instrumentation not in a power plant that require the quality program/documents, such as certain National Laboratories, disposal sights and test facilities.

　　(b)　Non 1E Instrumentation applications pertaining to use in a nuclear power plant that do not require a safety quality program or documentation (Commonly refer to as balance-of-plant).

2.　PRODUCTS INCLUDED BY THIS CONTRACT:

　　Any product approved for sale by the Nuclear Division



**EXHIBIT "C"**
**SCHEDULE OF COMMISSIONS**

1.    Nuclear Temperature products, 10% commission or as negotiated.

2.    Nuclear Pressure products, 10% commission or as negotiated.

3.    Spare Parts for Nuclear Temperature and Nuclear Pressure products, 5% commission or as negotiated.  Spare parts are defined as portions of a complete system, eg. bolts, screws capsules, gaskets, sealant etc.

4.    Any discounts to list prices will have a corresponding discounted commission.

5.    If and when "Representative" acts as "Distributor", then the net billing price of "Ultra NSPI" to "Representative" shall be the List Price or Selling Price minus the commission.  In such cases the "Representative" will place the purchase order with "Ultra NSPI" and no commission will be paid. "Representative" will be responsible for all delivery charges, import duties, and will collect directly from the customer.   "Ultra NSPI" will be notified of name and location of the end user for warrantee purposes.



**EXHIBIT "D"**

1.     A Purchase Order Credit of ten percent (10%) of the maximum available commission shall be given to the representative for the territory, which the order is to be billed.  In the case of multiple representative territories, the Purchase Order Credit will be given to the representative who has responsibility for the market segment in which the customer is located and such determination shall be made by Ultra NSPI at its sole discretion.

2.     An Order Influence Credit of eighty percent (80%) of the maximum available commission shall be paid to the representative receiving the Purchase Order Credit, except in the case where another representative or Ultra NSPI exerted order influence.  In such event, the Order Influence Credit shall be paid as determined by Ultra NSPI in its sole discretion.  Ultra NSPI may require that each representative involved submit a written claim.  If any representative fails to furnish Ultra NSPI with a written claim within sixty (60) days of the date the order is billed, then Ultra NSPI may disregard his or her claim.  If no claim is filed by any representative, then the Order Influence Credit shall be paid to the representative receiving the Purchase Order Credit.

3.     A destination Credit of ten percent (10%) of the maximum available commission shall be paid to the representative in the territory where the order is shipped.

EXHIBIT 2

# THE FOWLER LAW FIRM, PC

*Susan G. Morrison*
*smorrison@thefowlerlawfirm.com*
Robert Penn Fowler
J. Malcolm Harris
Terry Belt
John G. Lione, Jr.
Thomas J. O'Meara, Jr.
Adrian Van Zelfden JD/CPA
Laura S. Fowler
Kathryn L. Turpin*
Susan G. Morrison
John G. Pearce JD/CPA†
Roger D. Hepworth
Daniel M. Kowalski†
Teresa Villaseñor Harris
Steve R. Campos
Susan R. Littleton
David Scott Oliver JD/LLM
Roy William Cabler III JD/CPA
Miguel "Mike" Lopez, Jr.
Janet "Jan" L. Jackson
Kim Wilson Vincent
Lizbeth Lopez-Tristan
Enrique A. Maciel-Matos JD/MA**
Eva M. C. DeLeon
Sung Je Lee JD/MBA/LLM

919 Congress Avenue, Suite 900
Austin, Texas 78701
(512) 441-1411 (tel)
(512) 469-2975 (fax)
www.thefowlerlawfirm.com

I.D. Fowler (1868-1956)
Marion West Fowler (1901-1994)

December 21, 2015

Certified mail, return receipt requested
*CM/RRR No. 9402-6118-9956-3972-5889-10*
ULTRA Electronics
ATTN:  Dan Upp, President
PO Box 300
Austin, TX 78680-0300

DEMAND FOR PAYMENT RE:  Notice of Dispute under **Hank Rasanen's** Henry Controls, Inc. Sales Representative Agreement with ULTRA dated July 12, 2011

Dear President Upp and Board of Directors:

This firm represents Mr. Hank Rasanen and his company Henry Controls, Inc. (HCI) in his dispute with your company regarding his Representation Agreement and the company's breach of that agreement.  My client is requesting that his damages and attorneys' fees be reimbursed for this dispute.  Mr. Rasanen put you on notice of his objections on April 18, 2013 via email to Mike Ignasiak, with copies to Joe Chatham and Dave Robertson.  We assert that our positions are made in good faith and request swift resolution now that my client's damages are identified through a listing of multiple project that were being worked on by Henry Controls for the exclusive benefit of Ultra Electronics at the time of termination. Canadian Nuclear Power Projects, by their inherent nature, have an extremely long sales cycle and take several years of HCI's continuous investment in uncompensated sales effort time and expense before resulting in customer purchase orders and eventual compensating commissions after shipment of long delivery manufactured products.

The Sales Representation Agreement states in Article VII that "In the event either party terminates this Agreement without cause, the commissions on all orders entered by Ultra NSPI prior to the effective date of termination shall be paid to the Representative in normal time as stated in Paragraph 3.2."  Ultra terminated HCI's contract without cause.  In over 20 years of working together, no complaints were ever lodged against Mr. Hank Rasanen or his

company, HCI. To the contrary, Ultra allowed unethical sales calls on HCI territory customers and failed to provide field sales support to HCI for several years, in breach of the Exclusive Territory Agreement.

1.  We assert that the severance calculations should be based upon the attached Exhibit A for projects worked on by Henry Controls, Inc. for a total of $8.64 million in commissions. Any Texas court will be primarily concerned with ascertaining the true intent of the parties as expressed within the four corners of the Representation Agreement and severance terms. We take the position that the language is not ambiguous; or in the alternative, if ambiguous, should be interpreted against the drafter, Ultra Electronics, since the wording was non-negotiable at the time it was signed by Mr. Rasanen.

    Texas case law holds that a court examines contracts in their entirety in an effort to harmonize and give effect to all their provisions so that none will be meaningless. *MCI Telecomm. Corp. v. Texas Utils. Elec. Co.*, 995 S.W.2 647,652 (Tex. 1999).

2.  Mr. Rasanen's commissions should have been paid "by the third week of each fiscal month for any payment received in the previous fiscal month on which the Representative has earned a commission". **Section 3.2** To deny HCI's commissions would result in unjust enrichment by Ultra or an unknown third party.

**Please provide the following documents without delay:**

- Payout formulas and calculations used for any commissions to be paid on the list of projects in Exhibit A.
- Complete copy of the merger/purchase agreement between Ultra and Weed Instrument Company, Inc.
- Ultra's Board of Directors' meeting minutes and any other reports showing both verbal and written discussions of commissions paid or authorized for the projects listed in Exhibit A.
- Insurance policies and agent contact information for any coverage for commission disputes
- Other compensation or commission arrangements as in effect immediately prior to the date of HCI's termination.
- The clear and convincing evidence you plan to use with the Board to disprove HCI's claims and interpretations.

This letter constitutes our good faith notice of dispute and demand for Arbitration pursuant to §8.7 to enforce legal rights provided by the Sales Representation Agreement. I have already conferred with Karl Bayer to discuss his availability as an arbitrator in February or March in an effort to resolve this matter both expeditiously and amicably. We expect the commissions to be timely paid on or before January 11, 2016 and if not paid within fifteen

The Fowler Law Firm PC
Page 3 of 3

(15) days of receiving this demand, that reasons be stated for such denial by January 11, 2016, and the parties proceed to arbitration.

Please be reminded that Mr. Rasanen has an excellent reputation within the nuclear power industry and will pursue protection of his goodwill if necessary. Therefore, this dispute should remain confidential for the benefit of both parties. Please contact my office if you have any questions.

Trusting this letter finds you well, I remain,

Very truly yours,

*Susan G Morrison*

Susan G. Morrison

Enc.
SGM/emcd

Cc: Mr. Hank Rasanen (via email)
    Ultra's Registered Agent (via CMRRR)

**Damages Calculation for Ultra / Weed Breach of Contract with Henry Controls Inc.**

| | Million $ | | |
|---|---|---|---|
| | RTD's | Transmitters | Commission |
| Refurbishment - Life Extension | | | |
| Darlington 1- 4 | 7.2 | 12.0 | 1.92 |
| Bruce G.S. 3-8 | 10.8 | 18.0 | 2.88 |
| NB Power – Lepreau | - | 1.5 | .15 |
| Argentina – Embalse | 1.5 | 2.3 | .38 |
| Wolsong 2-4 | 4.5 | 6.6 | 1.11 |
| New Build | | | |
| Argentina – Atucha EC600 | 1.5 | 2.3 | .38 |
| Cernavoda 3-4 EC600 | 3.0 | 4.6 | .76 |
| Darlington 5-6 EC600 | 3.0 | 4.6 | .76 |
| 2013 – 16 Ongoing Various | 1.0 | 2.0 | .30 |
| | | Total | 8.64 |

2015-12-20

**Susan Morrison**

| | |
|---|---|
| **From:** | Susan Morrison |
| **Sent:** | Thursday, March 23, 2017 8:06 PM |
| **To:** | 'Nancy E. Fuchs (nancy.fuchs@apks.com)' |
| **Cc:** | Eva DeLeon |
| **Subject:** | New contact information & Motion to Compel Arbitration |

**Importance:**     High

Dear Ms. Fuchs,

We did not hear back from you after providing the missing Exhibit A that your client Ultra Electronics failed to forward to you regarding Mr. Hank Rasanen's commissions claim for Henry Controls, Inc. against your client.

Please let me know by Monday, March 27, 2017 by 5 pm if you are continuing to refuse arbitration and will not provide the documents we demanded in our letter dated December 21, 2015. If we do not hear from you, we will file a Motion to Compel Arbitration before March 31st.

Best regards,

*Susan G. Morrison*
**CHAMBERLAIN ◆ McHANEY**
301 Congress Avenue, Suite 2100
Austin, Texas 78701
Main:  (512) 474-9124
Fax:    (512) 474-8582
http://www.chmc-law.com

 

E-MAIL CONFIDENTIALITY NOTICE: This transmission may be: (1) subject to the Attorney-Client Privilege, or (2) an attorney work product, or (3) strictly confidential, or (4) any combination of the above. If you are not the intended recipient of this message, you may not disclose, print, copy or disseminate this information. If you have received this in error, please reply and notify the sender (only) and delete the message. Unauthorized interception of this e-mail violates federal criminal law.

**EXHIBIT 3**



KAYE | SCHOLER LLP

Nancy E. Fuchs
+1 212 836 8565 office
nancy.fuchs@kayescholer.com

250 West 55th Street
New York, NY 10019-9710
+1 212 836 8000 main
+1 212 836 6565 fax

January 22, 2016

*VIA EMAIL AND FEDERAL EXPRESS*

Susan G. Morrison, Esq.
The Fowler Law Firm, PC
919 Congress Avenue, Suite 900
Austin, Texas 78701

Re:    Hank Rasanen/ Henry Controls, Inc.

Dear Susan:

This is in response to your letter dated December 21, 2015 to Ultra Electronics, which was not received by Ultra Electronics until January 12, 2016.

You are claiming $8.64 million in commissions on behalf of Hank Rasanen and his company Henry Controls, Inc. under the July 12, 2011 Sales Representative Agreement between Henry Controls, Inc. ("Henry Controls") and Ultra Electronics, Nuclear Sensors & Process Instrumentation ("Ultra"). Although your letter references projects worked on by Henry Controls, Inc. on "an attached Exhibit A" it does not include any Exhibit A. Without that Exhibit and more information, we cannot understand the basis of the claim.

Nevertheless we are hopeful that we can put this dispute to rest by sharing our position on the termination of the Sales Representative Agreement and post termination payments to be made under it. As you know, Ultra gave notice of termination of the Sales Representative Agreement to Henry Controls on April 1, 2013. While we understand that Mr. Rasanen may have been unhappy with that decision (as stated in his April 18, 2013 email), Article VII of the Sales Representative Agreement clearly granted either party the right to terminate the agreement with or WITHOUT CAUSE by giving 30 days written notice to the other party. It further stated that if either party terminated the agreement without cause "the commissions on all orders entered into by Ultra NSPI prior to the effective date of termination shall be paid to the Representative in normal time". Ultra honored its contractual commitment and paid all commissions due; the last payment was made in June 2014 when the final order which had been booked under the Agreement prior to the effective date of termination was shipped. Although your letter seems to claim that your client is owed commissions for something beyond those orders, there is no provision in the Agreement providing for commissions on orders booked after the effective date

Chicago          Los Angeles      Silicon Valley
Frankfurt        New York         Washington, DC
London           Shanghai         West Palm Beach

63294175_1

Susan G. Morrison, Esq.                    2                    January 22, 2016

of termination and we do not see any basis for such a claim.  That said, if Exhibit A to your letter was intended to list projects Henry Controls identified in the April 18, 2013 email or projects listed in Section 2 of the March 2011 Canada Nuclear Plan submitted by Mr. Rasanen to Ultra, Ultra has confirmed to me that it did not book any of those projects after the effective date of termination of the Henry Controls' agreement and, in fact, has not booked any significant Canadian nuclear orders since that termination.  Given the language of the contract as well as these facts, we cannot find any viable basis for the claims asserted in your letter.

As to your purported demand for arbitration, we note a few things.  First, although your letter was dated December 21, 2015, Ultra did not receive it until January 12, 2016 -- as you know from the certified mail receipt.  Second, we are hopeful that the prior paragraph of this letter settles the issues raised by your letter and that arbitration is no longer necessary.  If it does not, the absence of the identification of the specific projects and amounts as to which your client contends he is entitled renders the demand defective, in that it is insufficient to put our client on notice of the details of the claim.  We would ask that you let us know more clearly the nature of your claim, including (i) the list of projects you intended to include on Exhibit A, (ii) the basis for the claim that a commission is owed to your client for those projects and the contractual provision on which you are relying (given the language of the contract noted above which limits commissions to orders entered into prior to the effective date of termination) and (iii) the components and calculation of the amounts you are seeking.  If there remain issues to resolve, we would like to first understand them and then have a discussion with you.  If issues remain for arbitration following our receipt of the information and such a discussion, we can then address the most effective, efficient and timely way forward.  Based on the above, though, we do not see the basis for any arbitrable claim and again must insist that you present one if you are seeking arbitration under the Agreement.

As to the documents requested, we again cannot provide you the first or last item on your list as we do not know which projects were to be identified on Exhibit A or have an understanding of the basis for your claim.  As to the others, we do not see their relevance to the question of whether your client is owed any commissions under the Sales Representation Agreement.  Again, while we are willing to discuss appropriate items relevant to a valid claim, we must first understand the claim and, at present, we do not.

We look forward to a prompt response from you.

                              Very truly yours,

                              Nancy E. Fuchs

NEF:rc
cc:  Daniel Upp

63294175_1

## Fuchs, Nancy

| | |
|---|---|
| **From:** | Fuchs, Nancy |
| **Sent:** | Friday, February 12, 2016 11:36 AM |
| **To:** | 'EDeLeon@thefowlerlawfirm.com' |
| **Cc:** | 'smorrison@thefowlerfirm.com' |
| **Subject:** | Hank Rasanen/Henry Controls, Inc. |
| **Attachments:** | [Untitled].pdf |

Eva,

I checked with my client and was told again that they had not previously received the attachment to Susan's original letter. So, thank you for sending it; I forwarded it on to the client and we have reviewed it.

The list you sent is similar to the one received by Ultra as part of Mr. Rasanen's March 2011 Canada Nuclear Plan and referred to on page 2 of my January 22 letter (a copy of which I attach again for your reference). While we noted one additional project ("Argentina-Atucha") and a new category ("2013-2016 Ongoing Category") on the new list, as well the deletion of the Hydro Quebec project and the increase in value of the products by 1.5-3.6x over amounts listed in the 2011 Plan (the derivation of the numbers and the commission column being a mystery since Ultra has not booked any of the listed projects), and we see that the list contains a "commissions" column, we must once again ask for an explanation of your client's claim.

As stated in my January 22 letter, given the termination of the contract in 2013 without cause as Ultra was entitled to do and payment of all amounts due Mr. Rasanen for orders entered prior to the effective date of termination under the contract (as well as the fact that Ultra did not book any of the projects identified on the list you sent), we still cannot understand the basis for the claim that commissions are owed. In that letter I asked that you let us know "the basis for the claim that a commission is owed to your client for [those] projects and the contractual provision on which you are relying (given the language of the contract as noted above which limits commissions to orders entered into prior to the effective date of termination)". You have not addressed this question and, as we do not see the basis for a viable claim based on the contract and the facts, we must again ask that you address this request.

Best regards,
Nancy

Nancy Fuchs
Kaye Scholer LLP
250 West 55th Street | New York, New York 10019-9710
T: (212) 836-8565 | F: (212) 836-6565
Nancy.Fuchs@kayescholer.com | www.kayescholer.com

**From:** Eva DeLeon [mailto:EDeLeon@thefowlerlawfirm.com]
**Sent:** Monday, February 08, 2016 11:03 AM
**To:** Fuchs, Nancy
**Cc:** Susan Morrison
**Subject:** Hank Rasanen/Henry Controls, Inc.

Ms. Fuchs:

To follow up on your letter dated January 22, 2016, since you stated that you did not have the exhibit to the letter, I have attached a complete copy of the demand letter that we sent to your client. I personally placed the letter and the exhibit in the envelope after scanning a copy for our records. I am not sure how you could not have received Exhibit A, unless for some reason your client failed to pass it along.

Best regards,

**Eva M. C. DeLeon**
Attorney & Counselor at Law
The Fowler Law Firm, P.C.
919 Congress Avenue, Suite 900
Austin, Texas 78701
(512) 441-1411; (512) 469-2975 (fax)

Email:  edeleon@thefowlerlawfirm.com
Website: http://www.thefowlerlawfirm.com/



*Tier 1 Immigration Law for the Austin, Texas Metro Area*
*Tier 1 Education Law for the Austin, Texas Metro Area*

E-MAIL CONFIDENTIALITY NOTICE: This transmission may be: (1) subject to the Attorney-Client Privilege, or (2) an attorney work product, or (3) strictly confidential, or (4) any combination of the above. If you are not the intended recipient of this message, you may not disclose, print, copy or disseminate this information. If you have received this in error, please reply and notify the sender (only) and delete the message. Unauthorized interception of this e-mail may violate federal criminal law.

| | |
|---|---|
| **From:** | Fuchs, Nancy |
| **To:** | Susan Morrison |
| **Cc:** | Eva DeLeon |
| **Subject:** | RE: New contact information & Motion to Compel Arbitration |
| **Date:** | Monday, March 27, 2017 12:18:00 PM |
| **Attachments:** | image001.png |
| | image002.png |
| | [Untitled].pdf |
| | [Untitled].pdf |

Susan,

I have to say I am quite surprised to hear from you after all this time and also by the contents of your letter.  I did in fact reply to Eva's February 8, 2016 email, which provided the Exhibit A that my client never received, four days after I received it.  For reference, I am resending you my January 22, 2016 letter and my response email to you and Eva dated February 12, 2016.  We continue to be baffled by your client's demand for additional monies and feel we are entitled to understand with specificity the basis for his claims, particularly since my client has never received orders for the projects identified on Exhibit A, either prior to the termination of your client's Sales Representative Agreement or thereafter.  We remain willing to have a conversation with you regarding this but would prefer you present in writing the basis for the commissions your client claims including:

    a.    the specific orders your client claims were accepted by NSPI as a result of your client's efforts,

    b.    the specific NSPI revenues which your client claims are the basis for the unpaid commissions,

    c.    the basis and calculation of the commission claim,  and

    d.    the provisions of the Sales Representative Agreement under which your client claims any additional commissions are payable.

Please let us know when we can have such a call or when we will receive the answer to our requests.   We continue to be unable to address a claim we cannot understand.

We assume that the short time in which you require an answer from me is intended to give you time to file a motion for the commencement of arbitration prior to the fourth anniversary of notice by our client of termination of your client's Sales Representative Agreement.   If that is the case, we are willing to grant your client a 30-day extension to permit you to prepare a response to our request to enable us to determine if there is any basis for your client's claim and to avoid unnecessary expenditure of time and money.   Please let us know promptly.

Best regards,

Nancy

_____

Nancy Fuchs

Arnold & Porter Kaye Scholer LLP

250 West 55th Street | New York, New York 10019-9710

T: +1 212.836.8565 | F: +1 212.836.6565

Nancy.Fuchs@apks.com | www.apks.com

**From:** Susan Morrison [mailto:smorrison@chmc-law.com]
**Sent:** Thursday, March 23, 2017 9:06 PM
**To:** Fuchs, Nancy
**Cc:** Eva DeLeon
**Subject:** New contact information & Motion to Compel Arbitration
**Importance:** High

Dear Ms. Fuchs,

We did not hear back from you after providing the missing Exhibit A that your client Ultra Electronics failed to forward to you regarding Mr. Hank Rasanen's commissions claim for Henry Controls, Inc. against your client.

Please let me know by Monday, March 27, 2017 by 5 pm if you are continuing to refuse arbitration and will not provide the documents we demanded in our letter dated December 21, 2015.  If we do not hear from you, we will file a Motion to Compel Arbitration before March 31st.

Best regards,

*Susan G. Morrison*

CHAMBERLAIN ♦ McHANEY

301 Congress Avenue, Suite 2100

Austin, Texas 78701

Main:   (512) 474-9124

Fax:     (512) 474-8582

http://www.chmc-law.com



cid:image004.png@01D1D6D3.B7EA1570

E-MAIL CONFIDENTIALITY NOTICE:  This transmission may be: (1) subject to the Attorney-Client Privilege, or (2) an attorney work product, or (3) strictly confidential, or (4) any combination of the above.  If you are not the intended recipient of this message, you may not disclose, print, copy or disseminate this information.  If you have received this in error, please reply and notify the sender (only) and delete the message.  Unauthorized interception of this e-mail violates federal criminal law.